1

2

3

4

5

6

7

8                         UNITED STATES DISTRICT COURT

9                        CENTRAL DISTRICT OF CALIFORNIA

10   RAFAELA HERNANDEZ,                    )   Case No. CV 07-5784-PJW
                                           )
11                 Plaintiff,              )
                                           )   MEMORANDUM OPINION AND ORDER
12          v.                             )
                                           )
13   MICHAEL J. ASTRUE,                     )
     COMMISSIONER OF THE                   )
14   SOCIAL SECURITY ADMINISTRATION,       )
                                           )
15                 Defendant.              )
     _____)

16

17                                     I.

18                               INTRODUCTION

19        Plaintiff Rafaela Hernandez brings this action seeking reversal

20   of a decision by Defendant Social Security Administration ("the

21   Agency"), denying her applications for disability insurance benefits

22   and supplemental security income.  Alternatively, she asks the Court

23   to remand the case to the Agency for further proceedings.  For the

24   reasons set forth below, the Agency's decision is REVERSED and the

25   action is REMANDED for further proceedings consistent with this

26   opinion.

27

28

II.

STATEMENT OF FACTS

Plaintiff was born on September 26, 1961, and was 45 years old at the time of the administrative hearing. (Administrative Record ("AR") 73, 395.) She was born and raised in Mexico and has a fourth grade education. (AR 272, 395.) She has past relevant work experience as a candy catcher.[1] (AR 407.)

Plaintiff filed an application for disability insurance benefits on January 26, 2005, and an application for supplemental security income on February 1, 2005, alleging that she had been disabled since June 21, 2001, due to a workplace accident in which she hurt her arm. (AR 61, 73, 116, 374, 393, 396.) After her applications were initially denied, she requested and was granted an administrative hearing. (AR 46-49, 57-58.)

Plaintiff appeared with counsel at the hearing on October 23, 2006, and testified that she spends her time caring for her 13- and nine-year-old children "as much as [she] can." (AR 398.) She also testified that she cooks "if the food is not too difficult to prepare." (AR 398.) Plaintiff explained that she is able to clean the house, except for vacuuming and mopping, but she has to work slowly because of her arm and back pain. (AR 398-99.) She testified that she relies on others to take her children to school because she no longer drives. (AR 399, 401-03.) According to Plaintiff, she spends most of her time doing light housework and reading. (AR 404.) She acknowledged having received vocational training to be a travel

---

[1] A "candy catcher" is a general utility helper in a candy manufacturing plant. *See* Dictionary of Occupational Titles, § 529.686-034.

agent, but explained that she was unable to pursue a career in the travel agency business because it involved extensive typing, which exacerbated her arm and shoulder pain. (AR 400.) She estimated that she could walk one block, sit for two hours at a time, and stand for three hours at a time. (AR 400, 405-06.)

After Plaintiff finished her testimony, the ALJ called a vocational expert to testify. The vocational expert pointed out that Plaintiff's prior work as a candy catcher was performed at the medium exertional level. (AR 408.) The ALJ then posed the following hypothetical question to him:

> If we have a hypothetical individual this lady's age, education, past history, she's literate in English, not fluent, she could do light work, but no forceful push, pull in the left non-dominant extremity and -- let's see. Also no over the shoulder reaching with the left -- non-dominant.

(AR 408.) The vocational expert opined that this hypothetical person could not perform Plaintiff's past relevant work, but could perform alternative work as a fast-food worker, cafeteria attendant, and housekeeper/cleaner. (AR 408-09.)

Plaintiff's counsel then questioned the vocational expert regarding a hypothetical individual as described by the ALJ, who also had marked limitations in the ability to maintain regular attendance and be functional, marked limitations in the ability to work in coordination with or in close proximity to other people without being a distraction to them, and marked limitations in the ability to ask a question or request assistance. (AR 410.) The vocational expert

testified that such an individual would not be able to perform the jobs identified by the vocational expert or any other type of work. (AR 410-11.)

On December 6, 2006, the ALJ issued a decision denying Plaintiff's claim under the Agency's five-step sequential evaluation process. (AR 12-27.) Plaintiff appealed to the Appeals Council, which denied Plaintiff's request for review on July 16, 2007. (AR 5-9.) Plaintiff then commenced this action.

III.

STANDARD OF REVIEW

"Disability" under the applicable statute is defined as the inability to perform any substantial gainful activity because of "any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). The Court may overturn the ALJ's decision that a claimant is not disabled only if the decision is not supported by substantial evidence or is based on legal error. *See Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989).

Substantial evidence "'means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971)(quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).) It is "more than a mere scintilla but less than a preponderance," *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1998), and "does not mean a large or considerable amount of evidence." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988).

4

IV.

DISCUSSION

Plaintiff raises three claims of error.  She argues that the ALJ failed to provide clear and convincing reasons for rejecting her allegations of disabling pain.  (Joint Stip. at 13-19.)  She also argues that the ALJ erred in rejecting the treating psychologist's opinion and, as a result, finding that Plaintiff's mental impairment was not severe.  (Joint Stip. at 4-13.)  Finally, she contends that the ALJ erred in failing to adequately consider the testimony of her husband.  (Joint Stip. at 19-25.)  For the following reasons, the Court finds that the ALJ erred in rejecting the treating psychologist's opinion and orders remand for further proceedings.

A.   The ALJ's Consideration of Plaintiff's Credibility

Plaintiff argues that the ALJ failed to provide clear and convincing reasons for finding that she was not credible.  (Joint Stip. at 13-16.)  For the following reasons, the Court disagrees and affirms the ALJ's finding that Plaintiff was not credible.

ALJs evaluate a claimant's testimony under a two-step analysis.  First, the claimant must "produce medical evidence of an underlying impairment which is reasonably likely to be the cause" the symptoms alleged.  *Bunnell v. Sullivan*, 947 F.2d 341, 343 (9th Cir. 1991).  Second, once the claimant produces this evidence, the medical findings need not support the severity of the symptoms, and the ALJ may not discredit the claimant's allegations solely on the ground that the allegations are unsupported by objective medical evidence.  *Id.* at 346-47.  In the absence of affirmative evidence that a claimant is malingering, the ALJ's reasons for rejecting the claimant's testimony must be specific, clear and convincing.  *See Lingenfelter v. Astrue*,

1    504 F.3d 1028, 1036 (9th Cir. 2007) ("[T]he ALJ can reject the

2    claimant's testimony about the severity of her symptoms only by

3    offering specific, clear, and convincing reasons for doing so.'"

4    (quoting *Smolen v. Chater,* 80 F.3d 1273, 1281 (9th Cir. 1996)); *Lester*

5    *v. Chater*, 81 F.3d 821, 834 (9th Cir. 1996).  If the ALJ rejects the

6    claimant's allegations as not credible, she "must specifically make

7    findings which support this conclusion." *Bunnell,* 947 F.2d at 345.

8    In doing so, the ALJ must identify what testimony is not credible and

9    what facts in the record lead to that conclusion. *Smolen*, 80 F.3d at

10   1284; *see also Lester*, 81 F.3d at 834 ("[g]eneral findings are

11   insufficient; rather, the ALJ must identify what testimony is not

12   credible and what evidence undermines the [plaintiff's] complaints").

13   In weighing credibility, the ALJ may consider, among other things, the

14   extent of treatment or any unexplained failure to seek treatment,

15   inconsistent testimony or inconsistencies between testimony and

16   conduct, and work records. *Orn v. Astrue,* 495 F.3d 625, 636 (9th Cir.

17   2007); *Smolen*, 80 F.3d at 1284.

18       The ALJ gave ten reasons for rejecting Plaintiff's testimony: 1)

19   medical reports from Plaintiff's worker's compensation case indicated

20   that she failed to put forth maximum effort on some testing; 2)

21   Plaintiff did not report to her doctors immediately after she was hurt

22   at work that her back was injured; 3) examinations conducted after her

23   workplace injury revealed that her back was fine; 4) Plaintiff's

24   reported daily activities to Dr. Yang were inconsistent with the

25   limitations she alleged in her application paperwork; 5) Plaintiff's

26   testimony at the hearing as to her daily activities was inconsistent

27   with the severity of the impairment she alleged; 6) Plaintiff claimed

28   that she was unable to work due to arm pain, but admitted having

6

1  received vocational training, which required frequent typing,

2  reaching, handling, and fingering; 7) but for shoulder surgery,

3  Plaintiff had not received aggressive medical treatment; 8) Plaintiff

4  testified that she could not drive due to anxiety and fear but these

5  symptoms were not supported by medical records; 9) Plaintiff's claim

6  that she did not go out often was contradicted by other evidence; and

7  10) Plaintiff acknowledged that group therapy and anti-depressant

8  medication had helped alleviate her symptoms of depression.  (AR 20-

9  21.)  The Court finds that four of these reasons are "clear and

10 convincing" and the others are not.[2]

11      First, the ALJ cited reports from Plaintiff's worker's

12 compensation case that revealed her failure to put forth maximum

13 effort on testing.  Specifically, the ALJ cited a 2003 report, noting

14 an apparent lack of maximum effort on range of motion testing of the

15 shoulder, on grip testing, and on range of motion testing of the

16 lumbar and cervical spines.  (AR 20.)

17      A June 27, 2003 Qualified Medical Evaluation documents that the

18 doctor who conducted the examination did not believe that Plaintiff

19 put forth maximum effort on examination of her cervical and

20 lumbosacral spines.  (AR 314.)  In fact, the report indicates that,

21 although Plaintiff exhibited limitations of the normal expected range

22

23  _____

24      [2]  Though the ALJ did not note this, it seems that she found that
   Plaintiff's impairments could produce the symptoms alleged.  (AR 19-

25 21.)  The ALJ did not specifically find that Plaintiff was a
   malingerer, despite having relied on Plaintiff's lack of effort on

26 medical exams as one reason for discounting her credibility.  (AR 20.)
   Thus, the ALJ could reject Plaintiff's pain testimony only for

27 specific, clear, and convincing reasons.  *Tommasetti v. Astrue*, 533
   F.3d 1035, 1039 (9th Cir. 2008) (quoting *Smolen*, 80 F.3d at 1281,

28 1283-84).

7

of motion, she was able to move about freely at times during the examination without evidence of spinal limitation and a physical examination of Plaintiff's spine revealed no abnormalities. (AR 314-16.) In addition, the doctor reported that Plaintiff exhibited significant deficits in the Jamar grip test that were not supported by evidence of atrophy or neurologic deficit. The report also indicates that Plaintiff exhibited reduced effort on range of motion testing of the shoulder in comparison to past test results. (AR 316.) Thus, the ALJ's first reason for rejecting Plaintiff's credibility is specific, clear, and convincing and is supported by the evidence. *See Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002) (ALJ properly discounted claimant's credibility based in part on failure to give maximum or consistent effort during physical examinations). As such, this reason is upheld.

The second reason cited by the ALJ for finding Plaintiff not credible was that she had not reported in a June 26, 2001 worker's compensation claim form that she injured her spine when she had fallen five days earlier at work. The record indirectly supports this finding, in that a doctor noted that Plaintiff had not reported back injuries on the form, though the form itself is not in the record. This would seem to support the ALJ's finding that Plaintiff was not credible, since she was alleging in 2006 that she hurt her back in an accident in 2001, but had not reported immediately after the accident that she had hurt her back.[3]

_____

[3] An alternative explanation for Plaintiff's failure to report back pain at the time of the accident is that the pain from her broken arm was masking it, but Plaintiff has not raised that argument here.

1      The ALJ's third reason for rejecting Plaintiff's credibility,
2  i.e., that doctors who examined her spine and neck after the accident
3  in 2001 did not find anything wrong with it, is not fully supported by
4  the record.  During her initial evaluation by a treating orthopedist,
5  Dr. Philip Sobol in October 2001, Plaintiff complained of left
6  arm/shoulder pain, as well as neck and back pain.  (AR 216.)  At that
7  time, Dr. Sobol reported slightly anterior head carriage with
8  straightening of the normal cervical lordotic curvature.  (AR 219.)
9  He also reported that palpation of Plaintiff's spine elicited a slight
10  to moderate tenderness and spasm over the cervical paraspinal muscles
11  and upper trapezial muscles.  (AR 219.)  Axial compression test and
12  Spurling's maneuver produced increased neck pain radiating to the left
13  shoulder.  (AR 219.)  Plaintiff further exhibited a decreased range of
14  motion of the cervical spine.  (AR 219.)  As to Plaintiff's
15  thoracolumbar spine, palpation elicited slight to moderate tenderness
16  and spasm over the thoracic and lumbar paraspinal muscles, in addition
17  to tenderness over the lumbosacral junction.  (AR 221.)  Plaintiff
18  exhibited a decreased range of motion of the lumbar spine and
19  increased pain upon straight leg raising tests.  (AR 221-22.)

20      Plaintiff continued to exhibit tenderness, spasms, and decreased
21  range of motion of the spine throughout her treatment with Dr. Sobol.
22  (AR 179-80, 188-94, 197, 198, 204-09.)  In Dr. Sobol's permanent and
23  stationary report on February 21, 2003, he diagnosed Plaintiff with
24  cervical/trapezial muscololigamentous sprain/strain with left upper
25  extremity radiculitis, cervical disc bulge measuring two to three
26  millimeters at the C4-C5 level, and thoracolumbar musculoligamentous
27  sprain/strain.  (AR 182.)  Dr. Sobol cited Plaintiff's spinal
28  impairments among the factors of permanent disability.  (AR 183.)  Dr.

9

1  Sobol recommended that Plaintiff receive future medical care for her
2  spinal injury.  (AR 185.)

3       Dr. Sobol subsequently prepared a second permanent and stationary
4  report on December 8, 2003.  At that time, he diagnosed Plaintiff with
5  cervical spine musculoligamentous sprain/strain with history of left
6  upper extremity radiculitis and a two- to three-millimeter disc bulge,
7  and thoracolumbar musculoligamentous sprain/strain.  (AR 163.)  Thus,
8  this third reason is not supported by substantial evidence in the
9  record.

10       Next, the ALJ found that Plaintiff alleged greater limitations in
11 daily activities in her submissions to the Agency than she reported to
12 Dr. Yang approximately one year later.  (AR 20.)  In a Function Report
13 dated February 12, 2004, Plaintiff claimed that she cooked, cleaned,
14 cared for her children, and kept up with her personal grooming, as her
15 pain permitted.  (AR 103.)  She stated that she could no longer work,
16 walk long distances, dance, run, lift, bend, kneel, and stand and/or
17 sit for long periods.  (AR 104, 108.)  She explained that she had
18 difficulty getting dressed due to her arm injury and that she required
19 assistance to wash and brush her hair.  (AR 104.)  She reported that
20 she prepared simple meals and that did light housework, such as
21 watering plants and dusting.  (AR 105.)  She further reported that she
22 went grocery shopping once a week and that she drove only when her
23 pain permitted.  (AR 106.)  Plaintiff explained that she talked on the
24 phone with others about twice a week.  (AR 107.)

25       During an evaluation by Dr. Yang in April 2005, Plaintiff
26 reported that she maintained a good relationship with family and
27 friends.  She also explained that she spent time caring for her
28 family, cleaning, cooking, driving her children to school, and helping

them with homework.  (AR 254.)  She claimed to be very active in her church.  (AR 254.)  She told Dr. Yang that she enjoyed going out with her friends, taking walks, going to restaurants, reading the Bible, and visiting with her grandchildren.  (AR 254-55.)

The Court does not see any material inconsistencies between Plaintiff's Function Report and her report of activities to Dr. Yang. Plaintiff described almost identical activities on each occasion, except for the fact that she clarified in her Function Report that she only engaged in those activities to the extent her pain permitted. Moreover, it is worth noting that Dr. Yang reported that Plaintiff "enjoyed" going out with her friends, taking walks, going to restaurants, reading the Bible, and visiting with her grandchildren, but that Dr. Yang's report does not specify how often Plaintiff was able to engage in these activities.  Accordingly, the Court does not find the ALJ's fourth reasons for rejecting Plaintiff's credibility to be clear and convincing.

The fifth reason cited by the ALJ was that Plaintiff's testimony at the hearing as to her daily activities was inconsistent with the severity of the impairment she alleged.  (AR 20.)  This finding is supported by the record.  Plaintiff testified that she could walk one block, sit for two hours at a time, and stand for three hours at a time.  (AR 400, 405-06.)  She explained that the only physical impairments limiting her ability to work were her inability to use her hands frequently, bend, and get up quickly.  (AR 406.)  Plaintiff's self-described physical limitations were not consistent with her claim that she was unable to perform any work activity.  This was a legitimate reason for rejecting her credibility.  *See Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989) (noting allegation of disabling pain

may be discredited by specific finding that claimant "is able to spend a substantial part of his day engaged in pursuits involving the performance of physical functions that *are* transferable to a work setting").

Next, the ALJ rejected Plaintiff's credibility because she complained of disabling arm pain, but was able to complete vocational training for a career as a travel agent, which required frequent typing, reaching, handling, and fingering. (AR 20.) Though it is true that Plaintiff completed the training (AR 399), and that training required frequent reaching, handling, and fingering (AR 409-10), Plaintiff testified that she did not pursue a career as a travel agent because the frequent typing exacerbated her shoulder pain. (AR 400.) The ALJ failed to discuss this testimony, which is consistent with her complaints of disabling shoulder and arm pain. Thus, the ALJ's sixth reason does not support a finding that Plaintiff was not credible.

The seventh reason cited by the ALJ was that, but for shoulder surgery, Plaintiff had received conservative treatment for her maladies. (AR 20.) This reason is supported by the record and is a legitimate reason for rejecting a claimant's claim that she is suffering from disabling pain. *See Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005). Other than an apparently successful right shoulder surgery in 2002, Plaintiff's treatment for her injuries generally consisted of pain medication and cortisone injections. (AR 322-41.) Although Dr. Sobol recommended that Plaintiff undergo another surgery on her right shoulder, Plaintiff ultimately declined because she found that the cortisone injections were "quite helpful."

1  (AR 322.)   Similarly, Plaintiff's mental health records reveal
2  conservative treatment, consisting of anti-depressant medication and
3  group therapy.   (AR 263, 268, 270, 274, 275-78, 280.)

4       The eighth reason cited by the ALJ for rejecting Plaintiff's
5  credibility was that Plaintiff testified that her fear and anxiety
6  prevented her from driving, but that this claim was not supported by
7  the medical record.   (AR 20.)   The Court disagrees.   The medical
8  record is replete with instances wherein Plaintiff reported her
9  complaints of anxiety and/or fear.   (AR 254, 257, 265, 266, 267, 273,
10 279.)   Although Dr. Yang reported that, at the time of his
11 examination, Plaintiff was able to drive, he also reported that
12 Plaintiff complained of anxiety at that time.   (AR 254, 256, 257.)
13 Accordingly, the ALJ's eighth reason for rejecting Plaintiff's
14 credibility is not clear and convincing.

15      Next, the ALJ rejected Plaintiff's credibility because she
16 perceived Plaintiff's claims "that she does not go out often" to be
17 inconsistent with "other data."   (AR 20.)   The Court cannot affirm an
18 ALJ's finding that is based on amorphous terms like "other data"
19 because the Court cannot discern what the ALJ was referring to and can
20 only affirm an ALJ's findings for the reasons she sets forth in her
21 decision.   Failure to specify a reason with any particularity requires
22 rejection of this ground.   *Moisa v. Barnhart*, 367 F.3d 882, 885 (9th
23 Cir. 2004).

24      Finally, the ALJ rejected Plaintiff's subjective complaints as to
25 the severity of her symptoms because she acknowledged that her
26 symptoms had improved with medication and group therapy.   (AR 20.)
27 Though the record supports the ALJ's finding that Plaintiff's
28 condition improved with medication and therapy (AR 255, 275, 276, 278,

403), Plaintiff explained that her improvement was only partial and that she still suffered from significant symptoms of depression.  (AR 265-68, 276, 278, 403.)  Because Plaintiff's claims of improvement are not necessarily inconsistent with her allegations of a disabling mental impairment, the Court finds that the ALJ's tenth reason for rejecting her credibility is not clear and convincing.

In the end, the Court concludes that four of the ten reasons cited by the ALJ for rejecting Plaintiff's testimony were legitimate and supported by substantial evidence in the record and six were not. These four reasons are clearly enough to support the ALJ's finding that Plaintiff was not credible and, therefore, that finding is affirmed.  *See Carmickle v. Comm'r Soc. Sec. Admin.*, 533 F.3d 1155, (9th Cir. 2008) (upholding ALJ's adverse credibility finding where only two of four reasons given by ALJ were supported by the record).[4]

B.   The ALJ's Consideration of the Treating Psychologist's Opinion

Plaintiff claims that the ALJ erred in rejecting the opinion of her treating psychologist Kathleen McGrogan.  (Joint Stip. at 4-13.) Within this claim, Plaintiff further argues that the ALJ erred in finding that her mental impairment was not severe.  (Joint Stip. at 8.)  As explained below, the Court agrees.

---

[4]   The four reasons the Court has upheld are: 1) Plaintiff failed to put forth maximum effort in testing by an independent doctor who was evaluating her medical condition for her worker's compensation case; 2) Plaintiff failed to report in June 2001 after she was injured at work that she hurt her back and neck in the accident, which she later claimed was the case; 3) Plaintiff's hearing testimony that she suffered from extreme limitations was contradicted by her daily activities; and 4) Plaintiff underwent conservative treatment to treat her infirmities.

14

The record reveals that Plaintiff began significant mental health treatment at the Los Angeles County Department of Mental Health, West Central Mental Health Center in January 2006.[5]   (AR 269-74.)   During an initial evaluation on January 25, 2006, Plaintiff complained of depression, dread, fear of being alone, and tearfulness.   She explained that she had gained nearly 50 pounds over the previous year, that she no longer bathed daily, and that she had lost interest in her family and husband.   (AR 269.)   Dr. McGrogan noted that Plaintiff's grooming was below average, her speech was soft, and she was isolated or withdrawn.   She further noted that Plaintiff's mood was dysphoric, tearful, irritable, and hopeless, and that she suffered from a lack of pleasure.   In Dr. McGrogan's view, Plaintiff's affect was appropriate but sad and she experienced irrational or excessive worry.   Her intellectual functioning was impaired, and her fund of knowledge was below average.   Dr. McGrogan also noted that Plaintiff's concentration was impaired by rumination and she was unable to correctly complete serial sevens.   (AR 273.)   Dr. McGrogan rated Plaintiff's Global Assessment of Functioning ("GAF") at 51.[6]   (AR 274.)   Ultimately, she

---

[5]   The record reflects that on at least one prior occasion Plaintiff was prescribed Paxil by a primary care provider.   (AR 294.) Treatment notes from the same facility also appear to indicate that she was diagnosed with clinical depression on at least two occasions. (AR 289, 290.)

[6]   A GAF score is the clinician's judgment of the individual's overall level of functioning.   It is rated with respect only to psychological, social, and occupational  functioning, without regard to impairments in functioning due to physical or environmental limitations.   *See* American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision* (2005) ("DSM-IV-TR") at 32-33.   A GAF score of 51-60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks OR moderate difficulty in social,

diagnosed Plaintiff with major depressive disorder, single episode, moderate, and referred her to a physician for medication management. (AR 274.)

Although the record does not include any intervening treatment notes from Dr. McGrogan, on July 5, 2006, she completed a Mental Work Restriction Questionnaire and an Evaluation Form for Mental Disorders, indicating that Plaintiff had been seen at the center monthly since January. (AR 265.) In the Evaluation Form for Mental Disorders, Dr. McGrogan reported that Plaintiff was driven to her appointments by family members and that she often forgot her appointments. (AR 265.) As of July 2006, Plaintiff continued to complain of loss of interest, fear of being alone, and daily crying spells. She told Dr. McGrogan that she had poor sleep, poor appetite, and felt fatigued. (AR 265, 266.) She described visual hallucinations, during which she believed that she saw individuals inside her house. (AR 266.) Dr. McGrogan reported that Plaintiff was easily distracted and forgetful, and that her judgment was impaired as indicated by her inability to make decisions regarding her own well-being. (AR 266, 267.) Dr. McGrogan diagnosed Plaintiff with major depressive disorder, single episode, severe due to acute exacerbation. She listed Plaintiff's prognosis as guarded. (AR 262, 263, 268.)

In the Mental Work Restriction Questionnaire, Dr. McGrogan indicated that Plaintiff suffered slight impairments in her ability to carry out short and simple instructions, maintain attention for two-hour segments, make simple work-related decisions, accept

---

occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV-TR at 34.

16

instructions, respond appropriately to criticism from supervisors, and respond appropriately to changes in a work setting.  (AR 262-63.)  Dr. McGrogan reported that Plaintiff was moderately limited in her ability to remember work-like procedures, understand and remember short and simple instructions, and sustain an ordinary routine without special supervision.  (AR 262-63.)  Dr. McGrogan also found that Plaintiff exhibited marked limitations in her ability to maintain regular attendance and be punctual, work in coordination with or in close proximity to other people without being distracted by them, complete a normal workday without interruptions from psychologically based symptoms, performing at a consistent pace without an unreasonable number of and length of rest periods, ask simple questions, and request assistance.  (AR 262-63.)

Concurrent with her treatment with Dr. McGrogan, Plaintiff was treated by psychiatrist Jay Wung at the same facility, whose impressions mirrored Dr. McGrogan's.  (AR 275-80.)  In his initial evaluation of Plaintiff on February 6, 2006, Dr. Wung reported that Plaintiff exhibited a depressed mood and that her affect was decreased in range but increased in intensity.  (AR 279.)  Dr. Wung diagnosed major depressive disorder, single episode, chronic, moderate; rule out Generalized Anxiety Disorder.  (AR 280.)  He assessed her GAF at 50 and prescribed her Wellbutrin.[7]  (AR 280.)  On February 22, 2006, Plaintiff presented to Dr. Wung with a sad mood, which was partly improved with medication.  (AR 278.)  He reported that Plaintiff's

---

[7]  A GAF score of 41-50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  DSM-IV-TR at 34.

speech exhibited a normal rate, but decreased volume, and that her
mood was "down."  (AR 278.)  On April 6, 2006, Plaintiff missed her
appointment with Dr. Wung.  (AR 277.)  On May 19, 2006, Plaintiff
presented to Dr. Wung with some improvement but complained of
headaches while taking Wellbutrin; Dr. Wung prescribed Effexor.  (AR
276.)  On July 7, 2006, Dr. Wung reported that Plaintiff had missed
her prior appointment and that she arrived four to five hours late for
her current one.  (AR 275.)  Plaintiff described improved mood on
Effexor but some recurrence of sadness after her prescription ran out.
(AR 275.)  Dr. Wung noted that Plaintiff's memory and concentration
were mildly impaired and continued her on Effexor.  (AR 275.)

Rather than relying on Dr. McGrogan's findings, the ALJ concluded
that consulting examiner Dr. Yang's April 2005 report "best captures
the claimant's mental functioning."  (AR 24.)  Dr. Yang opined in that
report that Plaintiff appeared within normal limits in all respects.
(AR 256-57.)  Ultimately, he diagnosed her with depressive disorder,
not otherwise specified, and rated her GAF at 67.[8]  In his view,
Plaintiff's psychiatric impairment had no impact on her ability to
work.

The ALJ rejected Dr. McGrogan's opinion regarding Plaintiff's
limitations for three reasons: 1) Dr. McGrogan's assessment did not
indicate a comprehensive mental status examination or quantification
of any abnormalities; 2) Plaintiff's report to Dr. McGrogan in January
2006 that anti-depressant medications were not helpful contradicted

---

[8]   A GAF score of 61-70 indicates "some mild symptoms (e.g.,
depressed mood mild insomnia) OR some difficulty in social,
occupational, or school functioning (e.g., occasional truancy, or
theft within the household), but generally functioning pretty well,
has some meaningful interpersonal relationships."  DSM-IV-TR at 34.

her statements to Dr. Yang in April 2005 that they were; and 3) Plaintiff's reports to Dr. McGrogan of symptoms of depression were inconsistent with other data.  (AR 24.)  Plaintiff claims that the ALJ's rejection of Dr. McGrogan's opinion was error.  For the reasons explained below, the Court agrees.

It is well-established that, "[b]y rule, the Social Security Administration favors the opinion of a treating physician over non-treating physicians." *Orn,* 495 F.3d at 631; *see also Aukland v. Massanari*, 257 F.3d 1033, 1037 (9th Cir. 2001).  A treating physician's opinion as to the nature and severity of an impairment must be given controlling weight if the opinion is well supported and not inconsistent with other substantial evidence.  Social Security Ruling ("SSR") 96-2p; *Edlund v. Massanari*, 253 F.3d 1152, 1157 (9th Cir. 2001).

Even where a treating physician's opinion is not to be given controlling weight because it is not "well-supported" or because it is inconsistent with other substantial evidence in the record, an ALJ must still consider various factors--including the length, nature, and extent of the treatment relationship; the amount of relevant evidence that supports the opinion; the consistency of the medical opinion with the record as a whole; and the speciality of the physician providing the opinion--in determining what weight to give it.  *Orn*, 495 F.3d at 631 (citing 20 C.F.R. § 404.1527 and SSR 96-2p).  Where the treating physician's opinion is contradicted by a non-treating physician's opinion, the ALJ must provide specific and legitimate reasons, supported by substantial evidence in the record, for rejecting the treating doctor's opinion.  *Id*. at 632 (citing *Lester,* 81 F.3d at 830).

The first reason provided by the ALJ for rejecting Dr. McGrogan's opinion and accepting Dr. Yang's was that Dr. McGrogan's notes did not indicate that she conducted a comprehensive mental status examination or quantification of any abnormalities. (AR 24.) Though this is true, it does not appear that Dr. Yang did, either. His examination was nearly identical to Dr. McGrogan's. He relied almost exclusively on Plaintiff's subjective complaints and on his observations of Plaintiff during the examination. (AR 254-57.) For example, Dr. Yang reported what he observed as to Plaintiff's grooming, attitude, speech, alertness and orientation, mood and affect, and thought content. (AR 256.) The only testing reported by Dr. Yang was with regard to Plaintiff's ability to do simple calculations, spell simple words, and name the current president. (AR 256.) Similarly, Dr. McGrogan relied on Plaintiff's subjective complaints, in addition to her observations as to Plaintiff's grooming, speech, alertness and orientation, mood and affect, and thought content. (AR 273.) In addition, Dr. McGrogan administered testing in the form of serial sevens. (AR 273.) In light of the nearly identical assessment techniques relied on by Drs. Yang and McGrogan, Dr. Yang's report was not inherently more reliable than Dr. McGrogan's and the ALJ was not justified in relying on it--and rejecting Dr. McGrogan's--on that basis.

The ALJ's second reason for discounting Dr. McGrogan's opinion was that Plaintiff's reports to Dr. McGrogan in January 2006 that anti-depressant medications were not helpful contradicted her statements to Dr. Yang in April 2005 that they were. The ALJ appears to have recognized that such inconsistencies would not be sufficient to reject Dr. McGrogan's opinions if Plaintiff's condition had

20

worsened between the time of Dr. Yang's evaluation and Plaintiff's commencement of treatment with Dr. McGrogan and cited four reasons for finding that the inconsistencies were not the result of a deterioration in Plaintiff's condition during that period: 1) Plaintiff's assertion as to the longitudinal history of severe mental problems was inconsistent with the evidence; 2) her testimony reflected that she remained fairly active; 3) her poor credibility rendered all of her allegations suspect; and 4) there was no documentation of any major change in circumstances since Dr. Yang's evaluation, except that Plaintiff's application for benefits had been denied and she appeared to have additional financial stressors. (AR 24.) The Court concludes that only two of these findings are supported by the record. More importantly, the Court finds that the ALJ erred by focusing on the Dr. McGrogan's January 2006 report and not on her July 2006 report. On remand, the ALJ should focus more on the July report.

First, Plaintiff's longitudinal history of mental problems, to the extent it has been documented, has been consistent for symptoms of depression. In 2004, she began complaining of depression to her primary care physician, who diagnosed her with clinical depression and prescribed Paxil. (AR 289, 290, 294.) At the time she filed her applications for benefits in January and February 2005, Plaintiff indicated that her mental impairments were partly responsible for her inability to work. (AR 61-62.) In April 2005, she reported to Dr. Yang that she was continuing to experience symptoms of depression. (AR 254, 257.) She continued, however, to allege severe limitations in functioning. (AR 257.) Dr. Yang confirmed a diagnosis of depressive disorder, but concluded that Plaintiff did not have

21

significant limitations in functioning.  (AR 256-57.)  By January
2006, Plaintiff sought out psychiatric treatment at the West Central
Mental Health Center for complaints of severe symptoms of depression.
(AR 269-74.)  She was diagnosed with major depression and prescribed
anti-depressants.  (AR 274-80.)

     The Court finds that nothing in Plaintiff's longitudinal history
is inconsistent with her complaints of depression.  In fact, every
doctor who has treated or examined her for complaints of mental
illness--including Dr. Yang--has diagnosed her with depression.  The
only difference in opinion between the doctors is as to the severity
of Plaintiff's condition.  Thus, this reason is rejected.

     The second reason the ALJ rejected the possibility of
deterioration was because Plaintiff's testimony reflected that she
remained "fairly active" by "caring for her children and grandchildren
and in completing household chores."  (AR 24.)  This ground is
supported by the record.  It appears Plaintiff was able to perform a
variety of daily activities that suggests that her depression did not
so limit her.

     The third reason the ALJ relied on for finding that Plaintiff's
condition had not deteriorated was that Plaintiff was not credible,
and, therefore, her claims of deterioration were exaggerated.  As set
forth above, the Court concurs with the ALJ's finding that Plaintiff
was not credible.  The ALJ's reliance on this ground for finding that
the inconsistencies were not the result of recent deterioration was
proper.

     Finally, the ALJ concluded that Plaintiff did not experience a
deterioration in her condition because there is no documentation of
any major change in circumstances other than the rejection of

Plaintiff's underlying applications for benefits and the resulting
financial stressors.  As to Dr. McGrogan's January 2006 report, the
Court would agree.  As to her July 2006 report, however, the Court
does not agree.  Plaintiff reported to Dr. McGrogan in July 2006 that
her oldest son had recently been incarcerated.  (AR 265.)  This,
obviously, is a changed circumstance which could lead to a
deterioration of Plaintiff's mental/emotional health.

Thus, the Court finds that two of the four reasons cited by the
ALJ for concluding that Plaintiff's condition had not deteriorated
after April 2005 are supported by the record and two are not.  On
remand, the ALJ should reconsider this issue in light of the Court's
order.

The third reason the ALJ cited for rejecting Dr. McGrogan's
opinion was that it was inconsistent with unspecified "other data."
(AR 24.)  The Court cannot uphold a finding that is based on
unspecified other data because the Court cannot determine what that
other data is.  For this reason, this justification is rejected.

Because the ALJ's reasons for rejecting Dr. McGrogan's opinion
are not supported by the record, remand is required for further
consideration of Plaintiff's mental impairment.  On remand, the ALJ
should again determine whether Dr. McGrogan's opinion is entitled to
deference or whether it should be rejected.  If Dr. McGrogan's opinion
is rejected, and Dr. Yang's opinion is accepted, the ALJ need not
conduct any further analysis under the five-step sequential evaluation
process.  On the other hand, if Dr. McGrogan's opinion is accepted,
the ALJ will be required to find at step two that Plaintiff's
psychiatric impairment is severe and analyze the case accordingly.

C.   The ALJ's Consideration of Third Party "Testimony"

In her final claim for relief, Plaintiff argues that the ALJ erred when she failed to consider the "testimony" of her husband, Everarolo Hernandez. (Joint Stip. at 19-21.) For the following reasons, this claim is rejected.

Mr. Hernandez filled out and submitted a form in which he described Plaintiff's limitations in activities of daily living. (AR 94-102.) According to Mr. Hernandez, Plaintiff was able to assist in caring for their children and performing household chores, such as cooking and cleaning. (AR 94-94, 95, 96.) Mr. Hernandez explained, however, that she needed some assistance with laundry, housekeeping, and cooking, and that the cleaning and cooking she did perform were limited by her impairments. (AR 94, 95, 96, 101.) He further explained that Plaintiff only drove when she felt well enough and that she required assistance in dressing herself and washing and brushing her hair. (AR 95, 97, 101.) Mr. Hernandez estimated that Plaintiff could lift about five pounds and could walk and sit for about 30 minutes, but could not kneel, bend, squat, reach, climb stairs, or use her hands. (AR 99.) Finally, Mr. Hernandez explained that Plaintiff could only pay attention for one hour, did not finish tasks that she started, and had difficulty handling stress. (AR 99-100.)

Testimony from someone in a position to observe a claimant's symptoms and daily activities is "competent evidence." *See Smith v. Bowen*, 849 F.2d 1222, 1226 (9th Cir. 1988) (quoting *Sprague v. Bowen*, 812 F.2d 1226, 1232 (9th Cir. 1987)); *see also Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001) ("Lay testimony as to a claimant's symptoms is competent evidence that an ALJ must take into account, unless he or she expressly determines to disregard such testimony and

gives reasons germane to each witness for doing so." (citations omitted )).  An ALJ must consider this testimony in determining whether a claimant can work.  *Stout v. Comm'r Soc. Sec. Admin.*, 454 F.3d 1050, 1053 (9th Cir. 2006); *Smolen*, 80 F.3d at 1288; 20 C.F.R. § 416.913(d)(4).  In order to discount the testimony of a lay witness, the ALJ need only "'give reasons that are germane to each witness.'" *Stout*, 454 F.3d at 1053 (quoting *Dodrill v. Shalala*, 12 F.3d 915, 919 (9th Cir. 1993)).

The ALJ rejected Mr. Hernandez's testimony because it conflicted with Plaintiff's report of daily activities to Dr. Yang.  (AR 20.) Although the Court has concluded that this reason was insufficient to reject Plaintiff's credibility, the standard for rejecting the testimony of a lay witness is far less demanding.  The reason cited by the ALJ for rejecting Mr. Hernandez's statements is germane to the witness.  The law requires no more.  *Stout*, 454 F.3d at 1053.  Thus, Plaintiff's objections to this finding is overruled.

V.

CONCLUSION

For the foregoing reasons, the Agency's decision is reversed and the case is REMANDED for further proceedings consistent with this Memorandum Opinion and Order.

IT IS SO ORDERED.

DATED:  January 6, 2009.

*Patrick J. Walsh*

_____
PATRICK J. WALSH
UNITED STATES MAGISTRATE JUDGE

S:\PJW\Cases-Soc Sec\HERNANDEZ, R 5784\Memo_Opinion.wpd

25